# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 12, 2016 Session

## LEMUEL LEWIS v. LYNN MOORE, ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 43096     Michael Binkley, Chancellor**

———————————————————

**No. M2015-02473-COA-R3-CV - Filed May 31, 2017**

———————————————————

In this breach of contract action, the plaintiff entered into a contract with a sole proprietor whereby he purported to purchase 10% of the sole proprietorship. The contract entitled the plaintiff to 10% of the cash withdrawals made from the business's account. It further provided that, should the sole proprietor dissolve the business and form a new entity of which she was a majority owner, the plaintiff would be entitled to 10% of the cash withdrawals taken by the sole proprietor from the new entity. Two years later, the sole proprietor closed the business and formed a new entity, a limited liability company, with another individual. The plaintiff filed suit, alleging breach of contract and violations of the duty of good faith and fair dealing. The trial court found for the sole proprietor, concluding that the sole proprietor was free to close her business at will. It further found that the sole proprietor did not breach the express terms of the contract, nor did she breach her implied duty of good faith and fair dealing, in closing her business and forming the LLC. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

D. Alexander Fardon, Nashville, Tennessee, for the appellant, Lemuel Lewis.

Douglas S. Johnston, Jr., Nashville, Tennessee, for the appellees, Lynn Moore, and Sandcliffs Media, LLC.

# MEMORANDUM OPINION[1]

## I.

Lynn Moore and her husband owned a home in Brentwood, Tennessee, and obtained a construction loan to build another home nearby on Monroe Lane (the "Monroe Lane Property"). As the July 2012 maturity day for the construction loan approached, Ms. Moore contacted several banks seeking to refinance the loan. But she had no success.

Finally, one of the banks offered to refinance the loan if Ms. Moore improved her debt-to-equity ratio by selling a vacant lot she owned on Hillsboro Road (the "Hillsboro Road Property"). Unable to immediately locate a buyer, Ms. Moore approached Lemuel Lewis, a long-time friend and former business colleague, to seek his assistance. Though initially hesitant, Mr. Lewis agreed to purchase the Hillsboro Road Property so that Ms. Moore might avoid defaulting on the construction loan.

On June 20, 2012, Mr. Lewis and Ms. Moore entered into a contract concerning both the Hillsboro Road Property and Ms. Moore's marketing and advertising business, Moore Media. Ms. Moore had owned and operated Moore Media as a sole proprietorship since 2002. The contract provided that Mr. Lewis would purchase the Hillsboro Road Property from Ms. Moore for $300,000 cash, and in turn, Ms. Moore would repurchase the lot for the same $300,000 after selling one of her other properties.[2]

In addition to the real property, Mr. Lewis also acquired rights in Moore Media. Specifically, the contract provided as follows:

> Lynn Moore agrees to sell Lem Lewis 10% of Moore Media in exchange
> for the above transaction plus $10.00. Effective July 1, 2012, Lem will

---

[1] The rules of our Court provide as follows:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

Tenn. Ct. App. R. 10.

[2] Additionally, should Ms. Moore find a buyer for the Hillsboro Road Property within two years, the contract stated that Mr. Lewis would sell the lot to the buyer, and Ms. Moore would receive all proceeds above $300,000. As the trial court explained, "[u]nder either scenario, Mr. Lewis would at best receive a return of his originally-fronted $300,000."

receive monthly payments of 10% of the cash withdrawals taken by Lynn [M]oore.

If Moore Media is dissolved or closes for any reason and Lynn Moore reopens a new company of which she and/or members of her family are the majority owner(s) (cumulatively), Lem Lewis will receive 10% of any draws and/or profits received by Lynn Moore in such new company. The intent of this clause is to insure a continuing investment in any and all future Lynn [M]oore entities in which [she] may be involved. This agreement only extends to successor companies which are in the same or similar businesses as Moore Media as of the date of this agreement.

Mr. Lewis and Ms. Moore both contributed to the contract language, notably without legal assistance. But Mr. Lewis drafted and added two days before closing the final paragraph quoted above.

At closing, Mr. Lewis delivered Ms. Moore a $300,000 cashier's check for the Hillsboro Road Property and a $10 cashier's check for "10% of Moore Media." This allowed Ms. Moore to refinance the existing construction loan and avoid default. For her part, Ms. Moore located a buyer for the Monroe Lane Property in October 2012. She sold the property for $1,190,000, and she used a portion of the proceeds to repurchase the Hillsboro Road Property from Mr. Lewis as promised under the parties' contract. Additionally, beginning in July 2012, she paid Mr. Lewis 10% of her cash withdrawals from Moore Media.

Sometime in 2013, about a year after entering into the contract, Ms. Moore asked Mr. Lewis to conclude their arrangement and to allow her to repurchase his interest in Moore Media. Mr. Lewis declined Ms. Moore's offer. In response, Ms. Moore stopped paying herself and making withdrawals from the Moore Media account. She did, however, continue to wire money to her personal account from the Moore Media account to pay personal bills.

Later, in April 2014, Ms. Moore sent Mr. Lewis a letter informing him that, effective April 14, 2014, she had closed Moore Media and formed Sandcliffs Media, LLC. According to the operating agreement for Sandcliffs Media, Ms. Moore had a 49% and Steven Leh had a 51% membership interest in the LLC. The letter went on that, because Ms. Moore had formed a new company of which she was not a majority owner, Mr. Lewis was no longer entitled to 10% of withdrawals or profits.

On April 21, 2014, Mr. Lewis filed suit against Ms. Moore and Sandcliffs Media in the Chancery Court for Williamson County, Tennessee, asserting claims for breach of contract and violations of the covenant of good faith and fair dealing. For relief, he requested damages "equal to 10% of all funds Ms. Moore received from Moore Media

3

from July 1, 2012, through April 13, 2014, less the $13,457.00 Mr. Lewis actually received from Moore Media for that same period." The complaint alleged that Sandcliffs Media was a "sham" and was created "for the sole purpose" of evading the contract. Thus, Mr. Lewis also requested a declaration that he was "entitled to, and must be paid, 10% of any draws and/or profits Ms. Moore receives from Sandcliffs Media" and damages equal to the amount due to him for the period of April 14, 2014, through entry of judgment.

After conducting a bench trial on September 1, 2015, the trial court determined that Mr. Lewis was not entitled to relief. First, the court found that that the June 20, 2014 contract did not convert Moore Media into a partnership and, therefore, Ms. Moore was free to dissolve the entity at will. Next, the court determined that Mr. Lewis did not have a continuing interest in Ms. Moore's withdrawals from Sandcliffs Media. It found that, under the express terms of the contract, Mr. Lewis's 10% interest in Ms. Moore's withdrawals from Moore Media terminated upon the dissolution of the business and the formation of a new entity in which Ms. Moore did not maintain a majority interest.

Finally, the trial court concluded that Ms. Moore did not breach the express terms of the contract, nor did she breach her implied duty of good faith and fair dealing, in dissolving Moore Media and creating Sandcliffs Media.[3] According to the court, the contract placed no limitation on Ms. Moore's ability to dissolve Moore Media or her ability to open a new business in the same line of business. The court also found that Sandcliffs Media was not a "sham entity" intended as a mere front for the dissolved Moore Media.

## II.

In non-jury cases, the trial court's findings of fact are presumed to be correct unless the evidence in the record preponderates against them. Tenn. R. App. P. 13(d). Evidence preponderates against a finding of fact if the evidence "support[s] another finding of fact with greater convincing effect." *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). We review a trial court's conclusions of law de novo, with no presumption of correctness. *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006).

On appeal, Mr. Lewis argues that the trial court erred in determining that Ms. Moore had the authority to unilaterally dissolve Moore Media. He also argues that the court incorrectly determined that Ms. Moore did not breach her duty of good faith and

---

[3] Prior to trial, Ms. Moore conceded that Mr. Lewis was due additional 10% payments through the date of Moore Media's dissolution. Accordingly, she sent Mr. Lewis a check for $1,847.50, the amount for which he was underpaid in 2013 and the first quarter of 2014.

fair dealing in closing Moore Media, creating Sandcliffs Media, LLC, and transferring Moore Media's assets to the LLC.

Addressing Mr. Lewis's first argument, we agree with the trial court that Ms. Moore had the authority to unilaterally close Moore Media. Mr. Lewis did not, as he claims, have an ownership interest in Moore Media. The parties agreed that, at least prior to the events of 2012, Moore Media was operated by Ms. Moore as a sole proprietorship. "[A] sole proprietorship is nothing more than an individual conducting a business for profit, which in turn becomes his income." *Koch v. Koch*, 874 S.W.2d 571, 576 (Tenn. Ct. App. 1993). It "has no separate legal existence or identity apart from the sole proprietor." 18 C.J.S. *Corporations* § 4 (2007). Indeed, this Court has noted that a sole proprietorship and its owner are "one and the same." *Ferguson v. Jenkins*, 204 S.W.3d 779, 786 (Tenn. Ct. App. 2006). Therefore, Mr. Lewis did not purchase an ownership interest in Moore Media because he could not purchase a 10% interest in Moore Media any more than he could purchase a 10% interest in Ms. Moore. Accordingly, Ms. Moore, as the sole proprietor, had the authority to close her business without Mr. Lewis's consent.[4]

The evidence does not preponderate against the trial court's finding that Ms. Moore did not breach her duty of good faith and fair dealing in forming Sandcliffs Media with Mr. Leh or in transferring Moore Media assets to the LLC. *See Dick Broad. Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (concluding that whether a party acted in good faith is a question of fact). We recognize that "[i]t is well-established that '[i]n Tennessee, the common law imposes a duty of good faith in the performance of contracts.'" *Dick Broad. Co.*, 395 S.W.3d at 660 (quoting *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996)). However, we have also held that "courts will not make a new contract for parties who have spoken for themselves." *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 492 (Tenn. Ct. App. 2003) (citing *Petty v. Sloan*, 277 S.W.2d 355, 359 (Tenn. 1955)); *see also Wallace*, 938 S.W.2d at 687 ("[T]he common law duty of good faith does not extend beyond the agreed upon terms of the contract and the reasonable contractual expectations of the parties."); *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009) ("If the contractual language is clear and unambiguous, the literal meaning controls.").

Here, the parties entered a contract that, as the trial court noted, specifically contemplated the possibility that Ms. Moore would dissolve her sole proprietorship and acquire a minority interest in a new company conducting the same business. When this

---

[4] Nothing in the record indicates that the parties intended to form a partnership. In his brief, Mr. Lewis stated that he "has never asserted that the June 2012 contract constitutes a partnership agreement." Rather, he argues that "once Ms. Moore sold Mr. Lewis 10% of Moore Media . . . Moore Media necessarily became a partnership." But, as discussed, Mr. Lewis could not purchase 10% of Moore Media. The evidence does not preponderate against the trial court's finding that no partnership was formed between Ms. Moore and Mr. Lewis.

5

precise situation occurred, Mr. Lewis filed a complaint seeking to have a court relieve him from the very contractual terms he himself drafted. We, however, "will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise." *Vargo*, 115 S.W.3d at 492.

The trial court further found that Sandcliffs Media was not a "sham entity" created to avoid the terms of the contract. The evidence also does not preponderate against this finding. The testimony at trial showed that Ms. Moore and Mr. Leh were friends and business colleagues for over 25 years, and around 2002, years before the June 20, 2012 contract was executed, the two began discussing their idea to combine forces to form a marketing and advertising business. Although delayed due to Mr. Leh's illness, Ms. Moore and Mr. Leh finalized their plan in 2014, when they closed their respective businesses to create Sandcliffs Media.

Both contributed to the new LLC. Mr. Leh contributed his extensive experience working for a large advertising agency, his contacts in the automotive industry, and two large clients. Ms. Moore contributed Moore Media's name and local reputation in addition to several smaller clients. Ms. Moore admitted that the ownership structure under which Mr. Leh became the majority owner was designed, in part, to defeat Mr. Lewis's potential interest in Sandcliffs Media. However, the ownership structure also reflected the parties' belief that Mr. Leh's contributions to the LLC were greater than Ms. Moore's contributions. In fact, Mr. Leh testified that he would not have agreed to form Sandcliffs Media with Ms. Moore unless he was made the majority owner.

### III.

For the foregoing reasons, we affirm the dismissal of Mr. Lewis's complaint.

_____
W. NEAL MCBRAYER, JUDGE